The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. We will hear argument in Corephotonics v. Apple 20-1424. Mr. Fenster, please begin when you're ready. Good morning, Your Honors, and may it please the Court, this is Mark Fenster for Corephotonics. The Court should reverse the PTAB's decision because substantial evidence does not support the determinations that prior art reference Ogino expressly discloses an embodiment that meets the TTL, Total Track Length, EFL ratio limitation, or that one of skill would be motivated to combine Ogino with Chen to meet Claims 14 and 15. I'd like to discuss first the Ogino anticipation and then move to obviousness. The Board's finding that Ogino expressly discloses a Total Track Length of 4.387 mm and therefore less than the EFL or effective focal length is not supported by substantial evidence and it does not meet the Board's construction. The Board's construction for Total Track Length specifically requires a distance to an actual sensor or film. That's at Appendix 18. In finding that, the Board specifically rejected Petitioner's proposal that Total Track Length be defined as a distance to include a theoretical image plane independent of the sensor or film. At Appendix 18, the Board found we are not persuaded that the evidence supports Petitioner's constructions which encompass a TTL measure with respect to an image plane that is independent or absent a corresponding sensor. Therefore, to show TTL, Petitioner and the Board have to show that Ogino expressly discloses a distance to an actual sensor. Ogino Example 6 suggests that you can remove the cover glass but does not tell where to place the sensor if you do. So, Example 6 has a cover glass and with the cover glass, it's undisputed. It has a Total Track Length of 4.489 that's greater than EFL and does not meet the limitation. It is true that Ogino says at Column 5 that you can remove the cover glass and thereby reduce the total length, but it does not say where to put the sensor. And that's important because the record evidence is that where you put the sensor is a design choice. It can be at an ideal image plane or it may not be. And that's at Appendix 14 where the Board specifically found that relying on evidence. So, Ogino does not disclose where to put the sensor. It just says that you can remove the sensor. The Board relied on the teaching of TL, Total Length, which is a defined term in Table 11 of Ogino. And, Your Honors, can I just verify that everyone hears me? Yeah. I know you're getting silence. It's worthwhile to check. Can you explain or point to where in the record is this the concept of back focal length that was used to calculate if the glass plate, glass cover was missing, what would happen to the focal length? Or maybe I've got the concepts confused. The concept of the error converted value that then contributes to the calculation of the TTL that the Board used. Thank you, Judge Stoll. So, this is in Ogino at Appendix 562 at Column 14. And this is where the Fujifilm reference, the Ogino reference, introduces the concept of back focal length being an error converted value for back focal length and using that value in the calculation of Total Length TL. So, notably, back focal length is just a specifically defined term as an error converted value. It does not tell you where to put the sensor. There's no record evidence from Sasean, their expert, or anywhere else saying that one of skill in the art understands that this is a teaching to put the sensor there. It's just a defined value. And back focal length, this error converted value, happens to be just an idiosyncrasy of the way Fujifilm, the assignee of the Ogino patents, happen to define Total Length. They are the only ones that we were able to find. Fujifilm has several patents that use back focal length with an error converted value. No one else seems to. And there's no evidence that that's a known value by one of skill in the art. This is not a term of art. And you're saying, this is just Toronto again, you're saying that there's no connection between the error converted value and an embodiment in which, not an expressly specified embodiment, but the taught embodiment of what's in Ogino, but minus the glass cover. There's just no relationship between the error converted value and the glassless embodiment? That's exactly right, Judge Toronto. There's no teaching in Ogino that the image plane is at the error converted value. There's no teaching that that's where you would place it. If you were to remove the cover glass, there's just no relationship. There's nothing in Ogino or the record tying the sensor location to that error converted value. And specifically, I want to point you to Column 5, which is the only teaching of an embodiment that you can remove the cover glass. So, this is in Ogino at Appendix 558, Column 565 through Column 6 to Line 2. And it says, alternatively, an effect similar to the optical member CG may be given to the film, fifth lens or the like, by applying a coating to the fifth lens, L5 or the like, without using CG. Thereby, it's possible to reduce the number of components and to reduce the total length. So, it does make that suggestion, but it does not tell you where to put the sensor. And specifically, it does not teach, if you did remove the cover glass, it doesn't actually disclose an embodiment that applies a coating to L5 or the like, which would affect the optical properties and may affect where you put the sensor. And so, it's a suggestion, but there's not a teaching. There is no disclosure of putting the sensor at 4.387 millimeters from the front of the L1. Instead, there's just this defined term TL, which is undisputedly different than the total track length defined by the board. How do we know that? Because table 11 is the table for example 6, which has a cover glass. And the TL, the defined term with the air converted value, is 4.387 with the cover glass. And the TTL for the cover glass is 4.489. And that's obtained by summing all of the distances in the DI column. And that's undisputed. I'm sorry, all of them or just up through 11? No, no, no, all of them. For TTL, that's true. And that's shown in the record at, I think it's 5.0. So- Counsel, this is Judge Stoltz. I just wanted a clarification there because I got confused when you said that's true. Are you saying you measure from 2 to 13 for the TTL? Yes. So for the TTL, it has to be the distance to the image plane R14. And so that is distance 13, which is the distance between R13 and R14. And so that is the distance. So that is true. For TTL, which if you look at Appendix 462, for example, this is in the Sossian Declaration that shows how you measure total track length. And the total track length goes from the object site all the way to the image plane. And so those distances are the ones D2 through D13. And that gives you 4.489, which is bigger than the EFL. And that's absolutely undisputed that that's how you measure TTL for Example 6 with the cover glass. Counsel, this is Judge Stoltz again. So just to clarify, I think you're just saying your argument, the same argument you've said before, which is there's no teaching of moving the image plane to where R13 is when you remove the cover glass, right? I think that's what you're saying. That is correct. Okay. And can I just ask, why is D1 not included in the summation? D1, I went through this at the oral argument with the PTAB, and there was a technical reason for it. That's not part of the object side. Even though it's a piece of lens plastic or glass sticking out toward the object. Yeah, I think there is some technical reason that's not relevant to our dispute, that the object side lens goes from D2, the distance D2, to D13. And so that in Table 11, the negative figure for DI for SI1 is just ignored? That is correct. Okay. Your Honors, if I could just take one minute on the obviousness combination of Ogino and Chen. This is quintessential classic hindsight motivation. There is nothing pointing one of skill in the art a priori to modify lens 2 to be meniscus. Ogino lens 2 is biconcave. It teaches that it's biconcave for very good reasons, and there's no teaching that would suggest one of skill in the art to move it. The proposed motivation is to reduce vignetting or improve illumination. There is no recognition in Ogino that those are a problem. There is no recognition or teaching in Chen that L2 is meniscus, or that the shape of L2 being meniscus or otherwise reduces vignetting, improves illumination, or anything else. There is nothing pointing the person of skill in the art to modify lens 2 specifically to make it meniscus. Go ahead. This is Judge Stoll. If I remember correctly, the board here relied on Apple's expert testimony. Isn't that right? I mean, why doesn't that provide substantial evidence? And there were two reasons in the board's opinion, right? The vignetting and also reducing aberration. Yes, but those are both post hoc rationalizations. So what happened here is Dr. Sasian, their expert, made the modification to meet the claim limitation, then compared it to the original, found that it was better in these regards, and said, yes, it's better, and therefore one would be motivated to do it. Critically, what's missing is there's nothing that Sasian points to or that Apple points to or that the board points to in either Chen or Ogino that would tell Dr. Sasian or one of skill in the art that making that modification would reduce vignetting, would reduce aberrations, or would improve illumination. Those all happened when you follow the recipe set forth in the claims because it was a good invention, but nothing in Chen or Ogino would point you to do that. And if you didn't have the roadmap of the claims to do it, he wouldn't have been able to go back and confirm it. That's post hoc rationalization, quintessential hindsight, not motivation to combine. There's nothing in Chen or Ogino that would lead one of skill in the art to do that, to make that particular combination, to do that. There's no teaching that making it meniscus improves illumination, reduces vignetting, or aberration. None of the reasons that they talked about have anything to do with motivation to combine. They're all just recognitions that it's better, but nothing pointing one of skill in the art to make that combination and try it in the first place. Any further questions at this point? Hearing none, we'll hear from Ms. Oliver then. Thank you. Good morning, Your Honors, and may it please the Court. Angela Oliver on behalf of Apple. The Court should affirm the Board's decision because the appeal is not eligible for R3X and substantial evidence supports the Board's decision. Regarding the R3X issue, it is Apple's understanding that the government has appeared to address this issue. So unless the Court has questions for Apple, we will rest on our briefing as to the R3X issue. Turning to the merits of the Board's analysis, the Court should affirm the Board's unpatentability determination. Both of Corporatonic's challenges to the Board's decision simply disagree with the Board's factual findings. There's no argument that the Board applied the correct law, nor are there arguments that the Board missed- Well, the argument-let's get to the specifics. So I'm not sure I'm going to summarize this correctly. On the initial question about Figure 6 and the TTL, I'm taking away the essence of Mr. Fenster's argument that the TL in Ogino is not the same thing as the TTL, that in order for you to get to the number you need, that you have to have an actual movement of the sensor. And whatever Ogino is teaching about the air conversion, it's not actually teaching about moving the sensor. And so you just can't get as construed TTL out of the idea that is in Ogino that you don't need the cover glass. Yes, Your Honor, that is Corporatonic's argument. What's wrong with that? Ultimately, the Board did specifically find that the calculations that are done based on Figure 6 and Table 11 show the specific distance that the image sensor or plane would move. That's at Appendix Page 26 and the Board Reader is at Page 29. So that's the Board's ultimate conclusion as to why this meets the TTL, is that that sensor does move and Ogino tells us precisely how much it does move. But there's a lot to unpack there because it all relates to Figure 6 and Table 11 and the specific way that you calculate the values based on these tables. So if the Court would bear with me, in the red brief, we've included these two tables back-to-back on Page 7 and 8, so it's easy to reference the two if that's helpful for the Court. But essentially, as the Court heard Corporatonic argue, Corporatonic's position is that you would be required to sum all of the rows in Table 11 from D2 through D13. And you can see in Figure 6 that that would take us essentially from the left side of Figure 6 all the way to Image Plane 100. And by the way, you agree, for reasons I have not yet understood, that D1 is to be ignored? That's correct, Your Honor. Both parties agree that the calculation should begin with D2. Okay. The dispute lies with where the calculation should end. And so you can see from Figure 6 that the CG element here is the cover block element. So it's expressly shown in Figure 6. And so Corporatonic's argument would sum D2 through D13, the distances all the way to that Image Plane 100, which is where the image center is. Now, the problem with that argument is that Figure 6 is not the only embodiment of this Example 6 that is disclosed in Ogino. So the Board specifically found that Ogino discloses an embodiment or an implementation of Figure 6 that does not include that cover block. And Corporatonic's expert admitted that when you have an embodiment that does not include the cover block, you do not count the distance of the cover block in the TTL measurement. The Board cited this at Appendix Page 25, citing the expert's testimony at Appendix Page 1916. And so when you look at this and you remove the cover glass, what you do mathematically to remove the cover glass is you're replacing glass with air. And so the calculation involves using the index of refraction of glass versus that of air because the two materials, of course, bend light in different ways. And so you use this calculation to convert the distance that you would have used when you were using glass there to the distance that you now need to use for air. And the Board explains this calculation in its opinion at Appendix 22. There's a footnote there. The Board actually explained exactly how this air-converted back focal length of value is calculated. As I've explained here, they cite the patent owner's response. And if the court looks to the patent owner's response there, you can see this is ultimately based on the testimony of Corporatonic's expert, Dr. Moore, who explained this in detail at Paragraph 66 of his declaration. And I'm sorry, so does Dr. Moore or your expert actually equate the mathematical conversion to a movement of the sensor? Yes. That is the ultimate effect of this because it eliminates, if you look at Figure 6, it eliminates the cover glass and replaces it with air. And so the values here are different. And so the expert explained that... Can I just add? So the D figures, those are just plain old physical distances, right?  So to say that you're doing a mathematical construct based on difference in refraction between air and glass is now doing something... I took it right at the heart of his argument, of Mr. Fenster's argument, was that that just isn't the same as... And there was no expert testimony to say it was the same as moving R-14 forward a little bit or, anyway, changing its location. All right. Sure. So where is the testimony that says this air conversion value calculation is the moving of the ultimate image plane or sensor? I don't think anything turns on the distinction for this, does it? No. There's no distinction between those two. Column 5 of OGENA explains that the sensor is disposed of at the image plane. Right. So where is the evidence that says this mathematical calculation equates to moving the sensor? Your Honor, I'll try to find a concise statement of that overall conclusion, but I think it is the direct effect of every bit of expert testimony that is in the record. Because, as Your Honor suggested, these are true distances between the two. And the experts explained that when you remove the cover glass, you change what you're adding to calculate the TTL value. You would then, instead of adding D11, D12, and D13 at the end, you would add D11, the air conversion, and D13. And that is the back focal length value that is disclosed at the top of Table 11. And that, when you add D2 through D10, plus that back focal length value, that gives you the 4.387 number, that TL value, at the top of Table 11. And, Your Honor, if I can find the ultimate conclusion regarding that being moving the image plane. Well, I know the Board said we find it, but I guess I'm looking for the underlying evidence. I don't think Mr. Fenster disputes that the Board said that, just that there's whether there's evidentiary support. Sure. So, the Board relied on Paragraph 48 of Dr. Satyan's declaration in multiple places in the analysis. It's a very long paragraph, and so I suspect the ultimate conclusion is in here, but I can't point the court to the precise statement at the moment. But it is, there's no other conclusion that can be reached when you look at the top of Table 11. Counsel, this is Judge Stoll. Is the part that you're looking for at Page Appendix 463 at the bottom, the bottom of what appears to be a chart, starting with the phrase, based on this? Yes, Your Honor, this certainly supports the ultimate conclusion, because this shows that in the implementation without the cover glass, that is how you calculate the total TTL value. It's the sum of D2 through D10, plus this error-converted value, the back focal length. So, again, there's really no other conclusion that can be reached from this, based on the expert testimony that we have, which is clearly supported by Table 11. And I think you said something, if I understood you correctly, to the effect that Dr. Moore, core photonics expert, said something similarly supportive. Is that right? Yes, that's correct. And I believe that's at Page 1916 of the appendix. That's in the deposition. Yes, that's correct. And so he explains here that in the implementation without a cover glass, there is no need to include the cover glass value, that length of the cover glass, in the TTL measurement. And so, again, that further supports exactly what Apple's expert has explained here. Can you turn to the motivation portion, the combination of Ogino and Chen, and why, without hindsight, a skilled artisan would have been motivated to use a meniscus in order to get improved qualities of either the two or three sorts that are at issue? Yes, Your Honor. So turning to that issue, this analysis is not motivated by hindsight. In fact, we can see clearly from the Board's analysis, step by step, that there was a problem that was identified in Ogino and a solution that is provided by changing the shape of the second lens to a meniscus lens using the lens system of Chen. So at the outset, at Appendix Page 38, the Board explained that the two lens systems of Ogino and Chen are very similar at the outset. You can see this even just by comparing the two figures of the two lens systems to see that the shapes of each lens in the entire system are very similar. So these are not two arbitrary selected lenses. These are very similar overall. So what is the evidence that a person of skill in the art would have thought that using a meniscus at the relevant place would help to solve these recognized problems? Okay, so if the Court would turn with me to Appendix Page 493. This is Dr. Sasyan, Apple's expert ray trace, showing the lens in Ogino before it is modified. And you can see from this diagram on Appendix 493 that there are two issues in Ogino as it is. Towards the top left, you can see vignetting. Essentially, there are light rays that are not passing through that second lens. And you can see that there's an aberration at the top right of this image. So again, here's two problems that exist in Ogino. And you can see that the vignetting, for example, is being caused by this second lens. So with that in mind, if the Court would turn to Appendix Page 496, this is Page 2 later. This is the system of Chen. Again, you can see overall it's a very similar lens system. But the difference is that that second lens – Your Honor, I see my time has expired. May I please continue? Yes. Thank you. This – here you can see the second lens in Chen. There is no vignetting that is occurring in that second lens. So you can see the shape of that is what is – a patient would have understood that that would be worth trying to fix the problem because it's not a problem in Chen, whereas it is in Ogino. And then finally, this is Judge Stahl. I just want to ask you a quick question. One of the things I hear your opposing counsel be saying is that, you know, there's nothing that would suggest to Opoza that these problems that are identified at Page A493 would exist, in fact, in Ogino. And so – except for, you know, maybe, you know, hindsight analysis or trying to come up with reasons to want to improve Ogino for litigation expired. So what's your response to that? Is your position that Opoza would look at Ogino and understand that these kind of problems are going to exist? Yes, absolutely, Your Honor. And this is clear from the testimony of Dr. Satyan. As the Board found, one of Skill in the Art uses these sort of lens design software programs through ZMAC to understand and tweak lenses and see how they work. And this – as soon as you put this into a computer, as seen at Appendix Page 493, you see that there are two clear issues in the Ogino lens. And so that is a problem that a placenta may want to adjust the lens and fix that. Now, of course, Coplatonics has argued in its briefing that vignetting may be desirable in some circumstances. But under this court's case law, any motivation to combine is sufficient. And here, a placenta would have known that there are problems, there are instances where you do not want vignetting. Specifically here, the Board explained, and based on expert testimony, that Ogino has a relative illumination of less than 50%, and that was understood to not be sufficient for cell phone cameras. And so because of that, this vignetting is what is causing that. And the Board explained this and cited expert testimony. And then the Board explained, again citing the testimony at Appendix Page 497, that once you make this change to the meniscus lens, it fixes the vignetting, it fixes the aberration, and it increases the relative illumination. So that is precisely why a placenta would have looked at these, and not in hindsight, but with respect to specific problems that could be improved, and particularly with respect to cell phone lenses. Can you just clarify? So let's look back at, I think it was 493, the picture. Can you walk through what I'm supposed to be seeing in the little red box labeled vignetting? Yes. So towards the top of that box, there's actually three green lines, the top three green lines. You can see that they get stuck after that second lens. They do not continue past the second lens through the third, fourth, and fifth, as the rest of the green lines do. They stop there. And that's the definition of vignetting. Essentially, it means that light rays cannot pass through the edge of a lens. And I'm supposed to see that because those three green lines stop, two of them before they get to lens three, one of them a millimeter inside lens three. Yes, that's correct. But they both get through lens two, right, according to the picture? Well, I'm not sure that that's perfectly accurate. Dr. Satyan explains this in text later on this page. So he explains that some of the rays refracted by the second lens don't pass through the entire lens. So even though maybe perhaps one of them seems to go a millimeter into lens three, the others certainly do not. And in any event, that's the overall effect of the vignetting, that they cannot pass through further, and it decreases the overall relative illumination, which is a specific problem with respect to cell phone cameras. Okay. Any further questions from the panel? Hearing none, Mr. Fenster, you'll have your rebuttal time restored. Thank you, Your Honors. So first, with respect to Ogino anticipation, the TTL defines the distance to the sensor. There is no disclosure where is the sensor. Where in Ogino does it say that the sensor is at the air converted value? There is nothing in Ogino that says that, nor does Satyan. And that is the critical disclosure. It says that you can remove the cover glass and can reduce the total length, but it doesn't say where to move the sensor to. The portions of Dr. Satyan's declaration do not support it. So at paragraph 48, we start at appendix 463, where Judge Stoll pointed counsel to. It does say the bare conclusion that it's a track length, but it does not say that's where you put the sensor. And more importantly, I want to point you to, there's no support for Dr. Satyan's statement. If you go to 464 at the bottom, he says this total track length of 4.387 was confirmed when Ogino's example 6 was entered into the LENS Design Program's ZMAX C section 9. But then if you go to section 9, which is at exhibit appendix 502, this is the ZMAX that he's relying on, and it shows the TOTR, which is the total track length, of 4.489. Nothing in here shows 4.387. Dr. Satyan's declaration does not say that the sensor is moved there, and his support does not support that. I'm sorry, where on 502 do I find the 4.489? Yeah, it's very hard to read, Your Honor. Oh, I see. Bottom right, TOTR, and that's undisputed in the record that that is the total track length, and he admitted that in deposition. If Your Honors would indulge me one minute on the Ogino-Chen motivation. Okay, really one minute. Okay. So what counsel points to with the ray tracing and the reduced illumination and the problem of vignetting are not problems recognized in Ogino. Nothing in Ogino describes that it has a relative illumination less than 50% or that there's a vignetting problem. This was after the fact analysis that Dr. Satyan then did. Once finding those problems, there isn't any teaching in Chen that a meniscus shape reduces vignetting, improves illumination, or aberrations. And so there's nothing motivating that combination. Rather, what he did is he made the modification, plugged it into ZMAX, found that it fixed it using the inventor's recipe of the O32, and that's in proper hindsight. There was no motivation to combine it in the first place because there's no recognition in Ogino of the problems and no teaching in Chen that the solution has anything to do with the shape of L2, especially when all of the teaching in Ogino as to lens 2 says it's biconcave for a reason and has important benefits. Okay. Thank you. Thank you, Mr. Fenster. And thanks to – oh, I'm sorry. We have Ms. Rush. Do we have Ms. Rush? Yes. Good morning, Your Honor. I'm sorry. That's okay. I was going to intrude and just ask if you did that intentionally because I know – No, it was unintentional. But I guess on Arthrex, you know what our precedent is. You know that the Supreme Court in the next four weeks is likely to decide something. We know what your position is. Is there something to add? The only thing that I would add here, Your Honor, is that to the extent that this Court is planning on issuing a written opinion in this case, addressing the Arthrex specific mandate issue, we request that that decision be made precedential. We've prevailed on the mandate issue specifically in a series of non-precedential decisions, document security, followed by Infinium, and followed by the earlier Kerfritonics case that Apple's counsel provided in a 28-J letter yesterday. And we assume that those decisions were non-prec because they were based in light of this Court's precedent in Caterpillar, but there does seem to be a misunderstanding of the mandate rule and the purpose of the mandate, and to the extent that this Court would clarify that, I think it would be helpful not just in these cases, but in other cases going forward. There aren't a lot of cases addressing that issue, except for the Ninth Circuit case that we cited in our brief and an Eleventh Circuit case, but we think it would be nice to have some clarity on that. Okay. Now I will say thanks to all counsel on the case today. Thank you.